**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF KANSAS**

**Carrie Schmidt** *individual AND as next friend of her son* **K.S.** *AND  as next friend of her daughter* **P.S.**

PLAINTIFFS

**v.**

**Brian Huff,** *in his individual capacity* as  Superintendent of the Gardner Edgerton Unified School District No. 231, Johnson County, Kansas

\*

**Gardner Edgerton Unified School District No. 231, Johnson County, Kansas**

\*

**Greg Chapman,** *in his individual capacity* as member of the Board of Education the Gardner Edgerton Unified School District No. 231, Johnson County, Kansas

\*

**Frank Bell,** *in his individual capacity* as Principal for the Gardner Edgerton Unified School District No. 231, Johnson County, Kansas

DEFENDANTS

*Jury Trial Requested*

1. PRESIDENT DONALD J. TRUMP ISSUED AN EXECUTIVE ORDER TITLED "**ENDING RADICAL INDOCTRINATION IN K-12 SCHOOLING**" ON JANUARY 29, 2025.




1

2. The Gardner Edgerton school district gives unfettered discretion to its teachers to display the teacher's political views on classroom walls and windows for the world to see.  Whether this school district wants to admit it or not, it is also a form of indoctrination and persuasion on subject matters that have nothing to do with core educational values.

3. Yet, after the school district ratifies the display of these radical political views for student consumption and influence, neither this school district nor its teacher will countenance publication or criticism of those views by any member of the public including the plaintiff Carrie Schmidt.  Ms. Schmidt now bears the marks of being exiled and banned in retaliation under the heavy hand of government bullying as a result of her whistleblowing efforts revealing the indoctrinating literature contained in this school's curriculum and library. This lawsuit seeks relief for this parent and all parents who dare to push back on government bureaucrats more interested in keeping secrets in preserving the sorry status quo of today's government schools (which rankings to dollars per student ratio is abysmal) rather than listening and changing with a view towards partnering with parents to refocus on the core values of education.

### VERIFIED COMPLAINT

Plaintiff Carrie Schmidt, on behalf of herself and her two minor children K.S. (alias) and P.S. (alias) who are students in the Gardner Edgerton School District, by and through counsel Linus L. Baker, files her Complaint against each of the defendants alleging as follows.

**JURISDICTION AND VENUE**

4. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C.§ 1983.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges the defendants' violation of the plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

6. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

**THE PARTIES**

7. Plaintiff Carrie Schmidt (Carrie) is a resident of the state of Kansas also residing in the Gardner Edgerton Unified School District No. 231, Johnson County, Kansas (USD 231).

8. K.S. and P.S. are Carrie's children who are currently students in USD 231.

9. Defendant Brian Huff is a natural person who was hired by the Board of Education for USD 231. He is sued in his individual capacity.

10. USD No. 231 is defined as a school district under Kansas law, and USD 231 may be subject to lawsuits. USD No. 231, by and through its official Board, is a body organized under Kansas law, that performs functions under color of law for purposes of 42 U.S.C. § 1983.

11. Greg Chapman is a current USD 231 member of the Board of Education of USD 231. Defendant Chapman is sued in his individual capacity.

12. Frank Bell is a Principal for USD 231. Defendant Bell is sued in his individual capacity.

<strong>GENERAL ALLEGATIONS AS TO ALL CLAIMS</strong>

13. Carrie's children K.S. and P.S. have attended USD 231 Gardner Edgerton Kansas school district since the beginning of the 2012-2013 school year.

14. USD 231 regularly posted, and allowed staff and students to post, brochures and posters from the group called GLSEN in its general hallways and classes. The GLSEN organization opposes efforts by legislators to ban LGBTQ books with sexually explicit themes in government and private schools.

15. GLSEN urges teachers to intervene when students in government schools draw graphics or pictures involving sex so as to make sure they are compliant with "gender ideology." GLSEN provides pronoun guided literature and also advocates hiding kids' gender transitions from parents and not disclosing to their parents purported "gender transitions."



16. The GLSEN organization provided a statement opposing President Donald J. Trump's nomination of Linda McHahon for Secretary of Education contending McHahon "would strip critical protections for LGBTQ+ students" and GLSEN "will not stand idly by while federal protections are attacked and corroded."

17. On August 29, 2022, Carrie made her first request to review the Tenth grade curriculum containing a book "The Absolutely True Diary of a Part-Time Indian" which contained vulgar and sexual content. Her son K.S. was in the Tenth grade. The book the teacher decided to replace this book with was a Twelfth grade curriculum book called "Wuthering Heights". These books are two different reading and comprehensive levels. Reading of the books occurred prior to notification to the parents.  In an email to Carrie the defendant Bell stated "Your son and his father desire to read Part-Time Indian in the class."  Defendant Bell knows that Carrie and K.S.'s father were divorced and has long been aware of the co-parenting issues between the parents of K.S.  Bell also stated that there was not another opt out book to choose from.

18. On October 12th, 2022, Carrie was scheduled to have several parent teacher conferences with K.S's teachers at Gardner Edgerton High School. When she went to K.S.'s Tenth grade English teacher's conference the defendant Bell randomly showed up and told Carrie that he was going to "Sit in" on the conference.  His condescending tone and the fact that he did not respectfully tell Carrie in advance that he was going to be present made Carrie feel unwelcome at the school during parent teacher conference time. Carrie has not been back to parent teacher conferences since that time because of Bell's intimidation after Carrie had requested USD 231 to review "The Absolutely True Diary of a Part-Time Indian" and speaking out at board meetings.

19. In March 23, 2023, the Kansas City Star published a story about Carrie's efforts:



### Johnson County school district keeps removing books after one mom keeps complaining

By **Sarah Ritter**
Updated March 24, 2023 9:43 AM |



A Gardner Edgerton mom has challenged several library books, leading the district to pull seven of them. Another three are under review. *Publishers*



No one challenged any book in the Gardner Edgerton district for at least a decade — until this school year.

For the past several months, one mom has brought one complaint after another, 11 in all, about library books. In response, administrators have pulled seven. Another three are being reviewed by a district committee, which will later recommend to the school board whether to keep or pull them as well.

20. On April 12, 2023, the Kansas City Star ran a story on USD 231 books:



### Moms for Liberty ramps up fight to ban more books in Johnson County school district

By **Sarah Ritter**
Updated April 12, 2023 2:18 PM |



A mass text went out to Johnson County residents asking them to join the effort to ban books in the Gardner Edgerton school district. *Screenshot*



Some Johnson County residents recently received a mass text message urging them to help Gardner parents "remove pornographic and sexual content from our schools!"

The text included a link to a Change.org petition, with more than 600 signatures, created by parent Carrie Schmidt, who has been challenging several books in the Gardner Edgerton school district. Both the text campaign and petition come as Moms for Liberty, a national conservative activist group, ramps up efforts in Johnson County to gain broader support for removing school library books they deem inappropriate.

6

21. Carrie became a member of the USD 231 Educational Services Advisory Committee since May 4, 2023.  The Committee investigates and reviews USD 231 curriculum, instruction, and assessment topics as well as reviews the accreditation process, progress, curriculum standards and Federal Programs.  The Committee makes recommendations to the School Board and Superintendent Huff about these matters.

22. Carrie has appeared at USD 231 school board meetings since 2021 through the present. In 2022 Carrie started to read to the board words, phrases, and descriptions contained in the USD 231 educational curriculum and library.

23. When attempting to read this material that is made available to minor aged students at USD 231 during the public comment section of the USD 231 open meeting, Carrie was stopped by the Board claiming the words she was repeating from the books available to USD 231 students was inappropriate at the meeting because children were present or listening.

24. On March 29, 2024,  Board President, Tom Reddin, texted Carrie at 2:40 p.m. that "Lana, Huff and I spoke the other day. We all agree that even though some are pushing to change the policy we want to leave it how it is. We have to hear every voice. Doesn't mean we have to agree, but we listen." He texted again saying Superintendent Huff "also gave praise to you for challenging the books, but not blasting it on social media and to Beth for all the work she is doing to stay on top of it. She has removed several without even forwarding to committee."  Carrie replied "I can easily get 10 people to put in a review for the same book. They just want to make it harder."

7

25. Defendant Board member Chapman's wife Erin- Louise Chapman is a librarian in the Kansas Turner school district.

26. At an August 2024 open meeting of the USD 231 Board Carrie was the only individual signed up to speak. While standing along the wall getting ready to hear her name announced to step to the podium after Board President, Tom Reddin announced that it was time for "hearing and requests and suggestions" from the public, the defendant Chapman interrupted and asked if he could speak (knowing the Board Persident was about to announce Carrie's name). While Chapman was speaking Carrie went to the podium. After Chapman finished his diatribe against Carrie finishing with "it seems like she just gets pleasure from reading books with questionable content to this audience where there are minors listening," Carrie asked Chapman to respond that five minute prepared speech. To that Chapman said "nope, you get your minutes" all the while knowing Carrie already had a 3 minute speech prepared. Carie's microphone was not turned on until approximately the last 20 seconds of her speech. Board President Tom Reddin, interrupted Carrie in the middle of her speech stating "for anybody who has kids at home watching this please pause it for a minute while she puts on her performance." Carrie went up to Assistant Superintendent, Ben Booth and asked him if she could say her speech again, because people at home couldn't hear her. Carrie's request was denied and she was told that the volume on the video would be turned up higher on the district's YouTube page following the day and that her speech could be read with the closed captions turned on. However, the Gardner Edgerton USD231's YouTube page with Carrie's speech

will not play the normal closed captions for the parts the Board disapproved of and of which the muted Carrie's microphone. Chapman's prepared speech:

*Chapman*: I assume I know what the speaker is going to talk about so, there have been 42 books sent for review, all except four from the same person. Of the 42 books sent for review so far fifteen have been pulled from the school librarians or committee. Five have been retained by the BOE and one of those five was the Bible. During the summer, Ms. Schmidt has made all kinds of allegations about our district and board of education. What is worth noting though is the fact that of the 17 books she claims on social media to have sent in for review at the time this was written only 8 have formally been submitted for review, some as far back as two years ago. She also has a misunderstanding of library books which are for enjoyment versus instructional materials, assigned books / materials. 99% of the books that have been questioned have not been instructional materials. That doesn't mean that they should be in our school, just a huge difference in meaning and importance. Another fact is the book "It's Perfectly Normal" that's shared on social media isn't even in our district. Speaking of formal reviews: one book of the 42 takes about 3 to 4 months to review once it's up to bat. The committee has to have time to read it, meet to discuss it, and then the board of education also has to have time to read it, then meet to discuss it as well. It's, it's the review process that has made it so that the books up for review haven't been pulled. Doing the math, 42 books should take about 10 and half to 14 years to go through the full process. As I mentioned before, thankfully several books didn't make it past the librarian currently at the helm, so thankfully we are not waiting 14 years. Speaking of that, many of the books were purchased by past librarians, several have been checked out, or have never been checked out, sorry, and at least 5 hadn't been checked out until the book review process had started coming to the board meetings. I will say that one positive thing that has come from this is it highlighted a gap in our weeding process. I have encouraged our administrative team to focus on our weeding procedures and put an emphasis on using "Musty and Crew" which I don't know what those mean but my, my librarian wife gave me those acronyms, but basically it means that we're going to weed on basis of condition, relevance, age appropriate content, what reflects the communities they serve, and if the information inside is outdated or not, plus many, many more things that they look at every time that they weed books. I've heard from a few librarians in our district that what they need from us is to find a way to give them time during contract hours to increase their maintenance time. For those who don't know, maintenance time is the best time to slowly weed through books, reshelve, reshelve books, repair damaged books, send late notices and research new books based on the guidelines the board as a whole has made clear is appropriate for our students. The American Library Association recommends up to 25% of their contract hours. While I don't disagree that a good portion of the books on the review list are not appropriate for public schools, Ms. Schmidt needs to understand that again while what she's attempting to do is not entirely bad it has gummed up the process, taken immense amount of time from our staff that should have been focused on weeding books,

teaching our students and digging into the data to help improve our students success in scores. It is entirely disingenuous to almost single-handedly bog down a transparent system with up to fourteen years' worth of reviews and then shout from the podium that we are taking too long and not doing anything about it.

**Schmidt**: [microphone turned off] That's not my issue…that's not my issue.

**Board president**: You'll have a minute.

**Chapman**: You'll have your time. We are doing exactly as Ms. Schmidt has asked and following our procedures. In an attempt to remedy this during my board comment time I will be asking the board to bring this policy up for discussion. I used to believe in the power of one voice, but this process has made it clear that one voice without understanding or discernment can cause more damage to a noble cause than an individual who just wants the issue resolved and working alongside the team. I supported her appointment to the Ed Services committee but she hasn't brought up this topic at the committee outside of the actual book reviews

**Schmidt**: [microphone off] I didn't know I could. I didn't know I could.

**Chapman**: That's, I'm still talking, I won't interrupt you.  In fact, I just said that. It seems like she just gets pleasure from reading books with questionable content to this audience where there are minors listening. Most of the books were not at the elementary level so they wouldn't have had access originally. Instead, again, it just feels like she wants the shock attention that is caused by reading the out of context sexual clips to the minors and adults in the audience. I know she means well and I don't disagree that we can improve our libraries, make way for better and appropriate books but how it's being handled is costing this community valuable time, effort and unfortunately valuable people who didn't cause the issue but have been drug through the mud by this continued and disingenuous rhetoric that we are doing it intentionally or just not doing it all. That's all I have.

27. Libs for TikTok posted the video of Chapman's statement on August 19, 2024, which had over 2 million views:





28. USD 231 continues to publish Chapman's statements at:

https://www.youtube.com/live/1_d9wn9xBJI?si=PGbWr2jdPjqRBDRq

29. Carrie wrote an email back to the below staff and board members of USD 231

stating the following:

**From:** Carrie Schmidt <cschmidt12@yahoo.com>
**To:** Ben Boothe <bootheb@usd231.com>; Heather Peeke <peekeh@usd231.com>
**Cc:** Greg Chapman <chapmang@usd231.com>; Jeff Miller <millerjef@usd231.com>; Tom Reddin <reddint@usd231.com>; Lana Sutton <suttonl@usd231.com>; Katie Williams <williamska@usd231.com>; Patrick Ross <rosspa@usd231.com>; Heath Freeman <freemanh@usd231.com>; Brian Huff <huffb@usd231.com>
**Sent:** Tuesday, August 13, 2024 at 11:49:23 PM CDT

11

**Subject:** Re: Follow-Up

Thank you Ben for letting me know. I appreciate it.

I want to quickly address something. There were several lies that were said about me yesterday, however the one I am going to focus fact checking is about the book "It's Perfectly Normal." I never said that it sits on the shelf in a district library. I said that it is mentioned in "Ban This Book" that is in our district. Words matter here. I explained how mentioning the book several times is also inviting that book into the young readers mind, which could make them curious to check out the book themself. The book is VERY bad. Not only that but "Ban This Book" has links in it that take you to the American Library Association's banned book list and on and on. You should see that I state all of this in my book review that I turned in yesterday.

One thing I do pride myself on is that I know my stuff pretty well and if I don't know it I ask.  I ask a lot of annoying questions to you all and you put up with it, which I appreciate. I know what books are recreational verses curriculum.  Even though it was proclaimed that I don't know the difference. However, we could say that all library books are considered instructional material in a way because they are used for book reports, but that's semantics. Bottom line is that I am not saying a book is in the library that is not. That's absurd.

Thanks for always putting up with me. I know you don't really have a choice in the matter, but know that at the end of the day I do have good intentions- even if my delivery sometimes is off putting.

Below are the screen shots of my post that Greg lied about yesterday. I have highlighted portions for quick review. I am pretty blunt in this post, which could offend people, but you will see I never say the book is physically in the district. I can take criticism, but one thing I cannot take is being accused of lying about something when clearly I am not. I am not looking for any kind of response from you at all. My only purpose for this email is to correct just one of the lies that was shared by Greg yesterday on his foolish quest to expose me.

30. The screen shots Carrie attached to the email are below:



**Carrie Schmidt**
Aug 4 · 🌐

❌"Ban This Book"❌
If there is one post you need to read ALL the way through to fully understand the depth of the issues with this book, it is this post. In my opinion there are multiple layers that make this book one of the MOST PROBLEMATIC books in USD231. This book is in 2 elementar... See more



**Carrie Schmidt** 9+ ✏️ 🔍

Posts    Photos    Videos

**Carrie Schmidt**
Aug 4 · 🌐

❌"Ban This Book"❌
If there is one post you need to read ALL the way through to fully understand the depth of the issues with this book, it is this post. In my opinion there are multiple layers that make this book one of the MOST PROBLEMATIC books in USD231. This book is in 2 elementary schools and 2 middle schools. The images below share what students can be exposed to just from reading this book. The content in "Ban This Book" is at the very end of the images I posted, so you can see that content as well.

Professionals in school districts need to realize that books can contain links and mention others books in them, that are harmful to children. This is something I found in the book "Ban This Book."

The main character in "Ban This Book" decided they were going to read all the books that a parent got banned from their school. One is called "It's Perfectly Normal." This book is mentioned several times, along with others, in the story. I had heard of this book before, so I looked it up. "It's Perfectly Normal" is OVER THE TOP sexual, with pictures, explains how to



The main character in "Ban This Book" decided they were going to read all the books that a parent got banned from their school. One is called "It's Perfectly Normal." This book is mentioned several times, along with others, in the story. I had heard of this book before, so I looked it up. "It's Perfectly Normal" is OVER THE TOP sexual, with pictures, explains how to touch and rub yourself to masturbate, even using the words "it feels sexy". It pushes gender ideology. It explains different ways to not get pregnant like using the "pull out method" or the "morning after pill". It goes into depth about abortion and explains how laws are being challenged and even explains what an abortion is. They go as far as to let the young reader know that there are people who are not giving correct information about abortion and that although they may look like health care professionals they aren't. They also say that these fake health care professionals are persuading "people to not have a safe and legal abortion" and are telling "people information that is not true." Basically the book "It's Perfectly Normal" is pushing abortion onto our children, to make them think it's "normal." This book inside a book explains what pornography and sexting means. It also explains how hate speech is based on a persons sexual orientation or gender identity, as well as race, color, and religion.

more hyper links where kids can find hundreds of more challenged books, such as the 'Top 10 Most Challenged Books of 2023.' This is very dangerous and careless that the district had allowed a book into elementary and middle schools that take children from webpage to webpage, exposing and encouraging them to read sexually explicit content such as "Gender Queer," "All Boys Aren't Blue," Let's Talk About It," "Tricks," "Flamer" and the list goes on.

What school districts need to realize with books like "Ban This Book," is that they aren't only bringing in 1 new book to their shelf, but they are bringing hundreds of books to their shelves inadvertently. It's a sneaky tactic that the author uses to encourage children to read highly sexual and racist content. In my opinion it's actually quite sick and perverted.

Although I am not a fan of the story line in "Ban This Book," I am more concerned that this book exposes children to hundreds of books that have pornography in them. Children are impressionable and we don't need our elementary and middle school students exposed to this, because some "professional educator" got lazy and didn't do their job properly. The Board of Education needs to gain control over the content in the district from elementary on up. They need to clean this disgusting mess that



bringing hundreds of books to their shelves inadvertently. It's a sneaky tactic that the author uses to encourage children to read highly sexual and racist content. In my opinion it's actually quite sick and perverted.

Although I am not a fan of the story line in "Ban This Book," I am more concerned that this book exposes children to hundreds of books that have pornography in them. Children are impressionable and we don't need our elementary and middle school students exposed to this, because some "professional educator" got lazy and didn't do their job properly. The Board of Education needs to gain control over the content in the district from elementary on up. They need to clean this disgusting mess that has gone on for decades under the administration's lead. The only way for them to do that is to take ACTION. Tom Reddin (President) and Lana Sutton (VP) have to get it together and take the lead of this. If they keep ignoring it, like they have been for the past 2 years, then they are complicit in the grooming and sexualization of children. I said what I said.

Now you know what I know.

based on a persons sexual orientation or gender identity, as well as race, color, and religion.

"Ban This Book" introduces the American Library Association's banned book list in the form of a link. At the end of the book there are "postreading writing, research and community activity" lessons. Activity #5 tells the young reader to use the ALA's link, that takes them to a list of challenged books, and instructs them to design a cover for one of them. Once you put the link in the search bar it takes you to the ALA's site where you get a list of 131 'Frequently Challenged Children's Books.' That web page then has at the top of it a menu bar which then sends them to another link that takes them to more hyper links where kids can find hundreds of more challenged books, such as the 'Top 10 Most Challenged Books of 2023.' This is very dangerous and careless that the district had allowed a book into elementary and middle schools that take children from webpage to webpage, exposing and encouraging them to read sexually explicit content such as "Gender Queer," "All Boys Aren't Blue," Let's Talk About It," "Tricks," "Flamer" and the list goes on.

What school districts need to realize with books like "Ban This Book," is that they aren't only bringing in 1 new book to their shelf, but they are

31. Chapman emailed Carrie, from his official usd231.com email address, along with

numerous other individuals with USD 231, the following:

It's good to see you took to heart our hour long conversation where I said "HOW" you go about doing things is what makes you unapproachable and makes people not want to get behind you. First chance you get, you private message me this same message (that's awesome, we can communicate, I'll own up to a mistake if I did) but then.....then you had to get your attention, and blast it to everyone without even

15

giving me time to respond. If you ever want to know why someone may not be including you in what's going on, asking your thoughts or opinions, or simply seeking you out for help, maybe think back to this. I had one of the hardest days I've had in a long time Monday, but still answered your call as I was climbing into bed.....in hopes that you would understand the speech I gave at the meeting. YOU are your OWN worst enemy, and cause more harm to your cause than anyone else.... You cried a bit when I said I won't reach out to you or call you, because every time I do, you do things like this. Last time it was two weeks of private messages, posts on FB, emails to the entire board.....

As you proved my point directly after my speech Monday, you have yet again proved my point here.

It's also hilarious that you basically admit that you don't write your own posts, because had you, you would have realized that according to you, you "never claimed it was in our schools" immediately, but you either cut and paste based on what your online group tells you to, maybe adding some Carrie theatrics to it, or you do so many even you don't know what you said, didn't say, etc etc.

Either way Carrie, do better, be better, and remember the old saying "You can catch more flies with a pile of crap than honey, however no one but the flies want the crap."

I told you before, I'm willing to work with you, but not while you're behaving like this! Also my one mistake, in understanding one of your many posts, doesn't even come close to the pages and pages of false claims, accusations, etc that you've made against our staff, the district, and this board.  If you don't like being lied about (even though this was unintentional) then think about how you make others feel when you do worse about them, and you do it in many forums, not just one, that according to you, "only 8 people watch anyway!"

Have the day you deserve,

Greg W. Chapman

32.  In response, on August 14, 2024 at 11:01 p.m., Carrie emailed to Greg

Chapman chapmang@usd231.com, Ben Boothe bootheb@usd231.com; Heather

Peeke peekeh@usd231.com; Jeff Miller millerjef@usd231.com; Tom Reddin

reddint@usd231.com; Lana Sutton suttonl@usd231.com; Katie Williams

williamska@usd231.com; Patrick Ross rosspa@usd231.com; Heath Freeman

freemanh@usd231.com; Brian Huff huffb@usd231.com; the following:  "***Greg, Don't***

***contact me ever again***."

33. On August 15, 2024, the organization "Libs of TikTok" posted the following including defendant Chapman's request to "dox" or otherwise retaliate against individuals:



34. On August 19, 2024, Pete Mundo with KCMO asked Carrie to go on his radio show to talk about the Libs of TikTok post, the books available to USD 231 students, her past history with USD 231 and her experience at the August 2024 school board meeting. KCMO news published this interview.




35. This publicity was embarrassing to one or more of the defendants and USD 231 administrative officials including the school board and the topic of books at the school repeatedly came up at school board meetings during the public comment section by various speakers.

36. The USD 231 Board then held a "special" meeting on September 3, 2024.  They voted to change their BCBI Public Participation at Board Meetings prior to the upcoming September 9th open meeting to state: "For the purposes of this policy, patron shall be defined as 1) a current resident within the published Gardner Edgerton School District boundaries/ or 2) parent/guardian of currently enrolled student; or 3) a current employee of the school district. At time of sign up, patron will need to provide resident address; or what school patron's child attends; or current position/type of employment in the district."   Thus, all the people who had signed up to speak (which the board was aware of their names and addresses) in support of Carrie were now deemed disqualified to speak.  This was another way the Board was manipulating the public debate.

37. In the Executive Order issued by President Trump it states in part that:

In recent years, however, parents have witnessed schools indoctrinate their children in radical, anti-American ideologies while deliberately blocking parental

18

oversight. Such an environment operates as an echo chamber, in which students are forced to accept these ideologies without question or critical examination. In many cases, innocent children are compelled to adopt identities as either victims or oppressors solely based on their skin color and other immutable characteristics. In other instances, young men and women are made to question whether they were born in the wrong body and whether to view their parents and their reality as enemies to be blamed. These practices not only erode critical thinking but also sow division, confusion, and distrust, which undermine the very foundations of personal identity and family unity.

38. The Executive Order stated:

Sec. 3. Ending Indoctrination Strategy. (a) Within 90 days of the date of this order, to advise the President in formulating future policy, the Secretary of Education, the Secretary of Defense, and the Secretary of Health and Human Services, in consultation with the Attorney General, shall provide an Ending Indoctrination Strategy to the President, through the Assistant to the President for Domestic Policy, containing recommendations and a plan for:
(i) eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology; and
(ii) protecting parental rights, pursuant to FERPA, 20 U.S.C. 1232g, and the PPRA, 20 U.S.C. 1232h, with respect to any K-12 policies or conduct implicated by the purpose and policy of this order.
(b) The Ending Indoctrination Strategy submitted under subsection (a) of this section shall contain a summary and analysis of the following:
(i) All Federal funding sources and streams, including grants or contracts, that directly or indirectly support or subsidize the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology:
(A) in K-12 curriculum, instruction, programs, or activities; or
(B) in K-12 teacher education, certification, licensing, employment, or training;

39. After President Trump issued this Executive Order  Carrie was aware that USD 231 was violating the spirit and intent of that Executive Order because of the advertisements, posters, and stickers placed on the walls and windows of USD 231, with no disclaimers, that USD 231 was endorsing and otherwise advocating indoctrination based upon gender ideology and discriminatory equity ideology.

40. The advertisements of GLSEN, as well as other signs signaling by color and symbol gender ideology remained on USD 231 campus. Carrie emailed the Assistant Superintendent, Ben Boothe, on January 30, 2025, asking "Does this affect the district's ability to use Epic! And other confusing books available for kids to read while at school?" Carrie attached the link to President Trump's executive order "Ending Radical Indoctrination in K-12 Schooling – The White House." Mr. Boothe responded back the same day and said "We'll need to check with our legal counsel. Given what happened with the EO related to Federal Funding and how quickly it was rescinded , we obviously need to move at an appropriate speed." On February 4, 2025, Carrie followed up with Mr. Boothe stating, "I am just following up to see if anything has been found out about my previous question." Boothe replied the next day saying "I reached out, and we are awaiting guidance from the Kansas Association of School Boards and the Kansas State Department of Education. I'll let you know when we hear more." Carrie's inquiry to USD 231 still has not been answered.

41. Carrie's son K.S. is on the USD 231 high school wrestling team. Carrie has volunteered to help make what are called "snack bags" for all the girls, JV and varsity boy wrestlers during for the days they have wrestling matches. With permission Carrie uses the teacher's lounge to fill the snack bags with crackers, fruit snacks, granola bars and applesauce. Once the snack bags are made they are placed in the wrestling teams coolers. Then, Carrie goes through their team totes and makes sure the wrestlers have enough plates, forks, knives, napkins, peanut butter, jelly, honey and bread in their plastic tote that travels with the wrestlers to their wrestling duels

and tournaments.  Carrie then tapes the signs to the totes and coolers which informs the coaches and the Athletic secretary what tote and cooler go with what team. This was a system already in place when Carrie volunteered. Carrie communicates with the Athletic secretary when she will be up at the school making these bags, what the status is of the food in the locked cabinet, so the Athletic secretary knows to purchase more food, where she puts premade snack bags and where the totes and coolers are placed in the office.  Carrie takes pictures of the totes and the cabinet to communicate better with the coaches and the Athletic secretary as to where everything is, so they can find it the next day. Carrie helped make snack bags during K.S.'s 2023-2024 wrestling season as well.

       

42.  Carrie prepares these snack bags in during off-school hours during in the evening around 6 to 6:30 p.m. Monday through Thursday and/or Friday's around 3:30 to 4 p.m.  Carrie coordinates each time she comes to the high school with the Athletic secretary Amy every time she is planning on being at the high school to make snack bags, see how much food is left in the cabinet, and organize totes. Carie has gotten food from a cart that Amy had by her desk, however food is typically locked in the cabinet that is located in the Teacher's Lounge bathroom. Amy kept the key to the

locked food cabinet on her desk on top of a Post It note that Carrie wrote on after the first time she got the key from the Athletic secretary Amy, saying "Thank you, Carrie."

43. Carrie historically takes pictures or videos,  the snack bags, the coolers, as well as the rooms and hallways.  On January 20,  2025,  Carrie couldn't get into the Teachers' Lounge. Carrie texted the Athletic secretary Amy, at 6:36 p.m. and said "The lounge is locked so I cannot get in there to do the kids bags."  Amy responded: "Sorry at a basketball game. If you find a janitor they can let you in." Amy added in another text: "If you go through to the 200 hallway there is a door that leads to the office and it's usually always unlocked."

44. Carrie routinely retrieves the key from Amy's desk in the office, then goes to the Teacher's Lounge to make snack bags, puts the snack bags in the wrestling coolers, organizes the totes and makes sure that the cooler and totes are in the office where the coaches and Amy can find them. Then Carrie gets tape off of Amy's desk to use to put the signs she made and brought to the school with her on to the front of the cooler and tote. Carrie returns the key and the tape back on Amy's desk.  One time Amy's tape dispenser ran out of tape, so Carrie had to find tape in the office to put the signs on the coolers and totes.  After everything is done, Carrie takes pictures of the coolers and anything else that would be helpful in communicating with the coaches or Amy so they know where everything is.

45. On February 3, 2025, Carrie went to the USD 231 high school on that evening to prepare these snack bags.  Carrie entered the building as usual.  She decided to walk

the halls downstairs before making the snack bags. Carrie went to the Teachers'
Lounge and made the snack bags and got everything ready as usual for the wrestling
team.  Carrie went upstairs to the room number that was on the promotional poster
for the Gay Straight Alliance Club. The lights were already on and the door was wide
open.  Carrie saw a poster on the far wall in the classroom. Carrie took pictures of the
wall. Carrie also saw the teachers classroom library and took pictures of book titles
since she has a vested interest in the reading material that USD 231 provides to their
students.  Carrie walked out of the classroom and saw another poster in the classroom
across the hall on the whiteboard. With the door open and lights already on, Carrie
walked into the classroom to take pictures of the posters on the wall that students
see every day. When Carrie was leaving the 400 hallway she saw a janitor  and as
she was about to walk down the stairs she saw another janitor who told her to have
a good night.  Carrie then went to the office where she has seen stickers on the
windows and doors for GLSEN. Because of President Trump's Executive Order and
Carrie's inquiries to USD 231 as to their intentions of compliance, Carrie saw the
same stickers and posters that appeared to Carrie to be in contravention of the spirit
and intent, if not the actual language, of the Executive Order.  Carrie took pictures
of those stickers and posters she saw in the rooms, hallways, and in the windows of
offices and classes that had been historically placed for student, staff, visitor, and
parent viewing.

46. USD 231 gives teachers and staff the discretion to post, advocate, or advertise all
of the below material























26









47. Carrie sent Libs of TikTok a picture she took which the it decided to post On "X"
(Twitter) on February 7, 2025, at 10:26 a.m.

 

48. On February 7, 2025, Carrie was at the USD 231 high school that afternoon making
snack bags and getting the coolers and totes ready for the wrestler's tournaments the
next day. When she was in the office organizing the totes she was confronted by
Superintendent Huff and another man.  The main office is connected to the teacher's
lounge. Defendant Huff accused Carrie of taking pictures of things. He accused her of
rummaging through teacher's private belongings which Carrie denied.   Defendant Huff

then said Carrie had given Libs of TikTok that photo and also claimed it disrupted the school day and that the teacher (whose name is on the flyer posted around the school) asked to leave school ground premises.

49. Carrie told Superintendent Huff she took the key from Amy's desk to open the food cabinet and then used tape for the signs. Carrie told him these were things that Amy, had given her permission to use or knew she was using for the wrestling team when she was up there like she always has. The tape she got from the teacher's lounge was used was for the signs on the tubs or sacks like she typically had done in the past. When Carrie finished the bags she returned the key and the tape to secretary Amy's desk.

50. All of the areas photographed by Carrie on February 3, 2025, were and are public, open to the public, and can be readily viewed by any visitor, student, or staff of USD 231. There is no prohibition in any USD 231 written policy that prohibits phones or other electronic devices possessed by guests or visitors and no policy exists as to visitors or guests taking pictures on USD 231 property.

51. The name, photo associated with the name of a teacher, along with the individual's school email address, are posted on USD 231's website if permission is provided by the teacher.

52. Carrie does not control the content of Libs of TikTok nor does she have any editorial control over comments published on that X. Anyone searching for the name "Robertson" or Louvau" could find one or the other with the associated email on the USD 231 website.

53.  On February 11, 2025, defendant Huff emailed Carrie at 10:23 a.m. with several

accusations and demands:

> You were in numerous areas that are obviously off limits to parents on February 7
> between 6:30 and 8:30 pm. These areas included academic halls, classrooms and the
> main office. You did not have any business in any of those areas nor permission to be
> there that evening that I am aware of.
> While in the office, you moved personal items in order to take pictures of certain items.
> You also spent time at the desks of secretaries where it is unclear what you did while
> at the desks. You indicated on Friday to me that you borrowed tape from a desk though
> it is unclear why you would need tape that evening.
> You took pictures that were posted to X on the Libs for Tik Tok page. This page has a
> history of members making threats toward individuals called out on the page. The
> teacher's name associated with the school and her affiliations on the window in the
> picture were all used by members of the page to send threatening messages.
> Your actions created a substantial disruption to school. The teacher had to leave
> school early on Friday. Numerous building and district administrators spent most of
> Monday researching this issue to get an idea of exactly what happened.
> Other staff are apprehensive of being the next one for you to call out and make
> miserable. This is also a substantial disruption to our operations.
> I have also instructed the high school to work with the Gardner Police Department to
> file a police report regarding your entry into the office and classrooms without
> permission or purpose. This will also offer the opportunity for you to respond to the
> allegations.

54. Superintendent Huff did not notify Carrie in the letter that he was considering any

discipline or adverse consequences to Carrie as a part of his inquiry.  Rather, he simply

said he was "crafting a letter addressing the issues below" which was innocuous on its

face. Defendant Huff cited no USD 231 policy he was purportedly operating under.  Had

Carrie been notified that Superintendent Huff's email was purposed as a kind of

indictment with substantial consequences of having her daughter removed from class,

being removed from the Education Committee, or being banned from USD 231 property

she would have attempted, in the very short time frame given by Huff, to attempt to

vigorously defend herself at least with facts similar to those set out in this Complaint.

31

55. Defendant Huff then emailed his letter dated February 11, 2025, which USD 231 banned Carrie from all USD 231 property, as well as any property of a different school district in which USD 231 was present in any capacity. Defendant Huff also issued his own no-contact order telling Carrie she could have no contact with USD 231 teacher Hanna Louvau at any time.

The purpose of this letter is to address certain actions taken by you in violation of Board policy and state law that have resulted in threats, intimidation, abuse and harassment directed at school district personnel and students which has caused a material disruption to the school environment. Specifically, during your visit to the high school on Monday February 3, 2025, you entered into and took several pictures of classrooms, offices and other areas in the school building to include a picture of the classroom door of a teacher, which was then posted on social media. The taking and posting of this picture was done without the permission and consent of the teacher or the school district and is in contravention of Board policies including Board Policy KGB, KBC, KGD, KGDA, KFD & KM and state law. As a direct result of your actions, numerous threats have been personally directed at the teacher causing her and others to feel harassed, bullied and intimidated causing harm to her and disruption to the school environment. Given your prior experience with social media postings and the resultant threats, harassment, intimidation and disruption, your present conduct was clearly intentional and designed to bully, intimidate and harass the teacher and others, including students, within the district. This type of conduct is inappropriate, unacceptable and cannot be tolerated in our schools.

Accordingly, based on your conduct, you are no longer to serve on the ED Services committee. In addition, for the balance of this school year (through June 30, 2025), you are no longer welcome to be on school district property or attend school events or activities without express written permission from building administration. Your presence on school district grounds or at school events or activities, both home and away, without express written permission from building administration will be considered to be and enforced as a trespass.

At no time are you to have any contact with Hanna Louvau and, during any permitted presence on school property or attendance at a school event or activity, you are not to engage in any conduct in violation of Board policy.

You will need to make specific arrangements with building administration to schedule a time for conferences with teachers this week.

56. Unknown to Carrie, one of the window's she took a picture of was of the room assigned to teacher Louvau. Teacher Louvau is P.S.'s seminar teacher. Seminar is where students can get their homework done, go get help from another teacher, make up a test and some clubs meet during that time.

57. Defendant Bell emailed Carrie on February 12th, 2025 and shared his communications with P.S. on February 11, 2025, which was before Carrie received Defendant Huff's 4 p.m. ban letter. Unknown to Carrie Defendant Bell planned on pulling P.S. aside that day to talk to her about removing her from her seminar class and to possibly interrogate her with no parent present. P.S. was excused from school early that day which meant the interrogation did not occur.

58. When Carrie asked defendant Huff if she could attend K.S.'s graduation night and her son's wrestling match, defendant Huff referred Carrie to the school Principal to obtain an exception to the ban imposed by Huff.  Defendant Huff did not explain why he was delegating to Principal Bell the task of receiving Carrie's exception requests to Huff's ban.

59. Despite Carrie being told that Principal Bell would receive the request or be the decision maker (Carrie did not know which) as to whether any exceptions would be given to the ban, defendant Bell characterized Superintendent Hush's letter as a "no-trespass letter from USD 231" and that Bell knew "the permission requirements for you to be on the property of Gardner Edgerton High School."

60. Bell then stated to Carrie he had "communicated with Superintendent Huff, and the building administration of GEHS" and that Carrie only had permission to attend her

son's Senior Night at the USD 231 high school on February 13, 2025.  Bell told Carrie that she could only be present on the "PE wing" but that "all other parts of our building are off-limits."  Bell told Carrie that he was reassigning P.S. to a different seminar class, that he had called P.S.'s father and that the father "was naturally curious about the circumstances for the change."  Bell told Carrie that instead of Bell explaining to the father what Superintendent Huff had done, he said Carrie should be the one to explain the circumstances to P.S.'s father.

61. Bell told Carrie that beyond Senior Night, she was required to obtain permission from "GEHS building administration for permission to be anywhere on our campus."  Bell told Carrie to email Bell one request at a time and for each request he would "respond back to your email with the school's decision."  Bell told Carrie that if she had any questions that she should contact defendant Huff – "seek him out directly."

62. The communications and procedures were confusing and confusing to Carrie.

63.  Bell told Carrie that he was actually her advocate and that he would convey her requests for permission that he would "respond back to you with the school's decision."  Carrie responded telling Bell she was relying on him.  Carrie had asked both defendant Bell and Huff what legal authority USD 231 was relying on to prohibit Carrie from associating with her son or others on a different school district property or at State tournament located in Overland Park Kansas.  Bell responded saying "please work directly with Superintendent Huff."  Bell told Carrie that getting her permission was a "privilege for you that I advocated for."

64. The communications and procedures were confused and confusing to Carrie.

65. Bell also told Carrie that "Regarding our Graduation Commencement Ceremony, I would hope that with time, you would demonstrate proper civic behavior to our high school community, and honor the expectations of the letter you received. I made a good faith effort on your behalf, and advocated for you to be able to attend Thursday's Senior Night without receiving a request directly from you."

66. Carrie asked Bell, as her advocate, to identify the decision makers he was advocating on behalf of Carrie, as well as those communications.  Bell ignored those requests.

67. Bell told Carrie that Huff's "letter stated that you are not to attend any events, home or away. Defiance of that expectation does not demonstrate that you intend to honor the expectations of USD 231, and that will make it more difficult for me to advocate on your behalf in the future."

68. Defendant Principal Bell concluded stating:

Candidly, it will take some time and healthy civic behavior on your part, to earn the school's trust once again. Your recent choices have created a major disruption at Gardner Edgerton High School. Regretfully, I read nothing in your email response that even acknowledged any of that, or that you had any remorse.
Even so, our hope is that time and good behavior will heal what has been done, and we can enjoy a productive parent-school partnership - for the betterment of all students.

69. Carrie asked again about the graduation ceremony which Bell said "you do not have our permission to attend any future GEHS functions, home or away, including our Graduation Commencement Ceremony."  Bell told Carrie that all teacher conferences would be required as Zoom or telephone conferences.

70. Bell told Carrie that he had "demonstrated a good faith effort by allowing you to attend an event tonight, giving you the benefit of the doubt that you will comply with the letter's directives."  Bell told Carrie in the email that he hoped that Carrie would "honor the Superintendent's expectations allowing future events (Graduation, banquets, meets and concerts, etc.) to be considered, when I advocate on your behalf to him."

**FIRST CAUSE OF ACTION**
**(NOTICE AND OPPORTUNITY TO BE HEARD AND VAGUENESS)**
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE**
**U.S. CONSTITUTION AGAINST ALL DEFENDANTS NOT NAMED GREG CHAPMAN**
**(42 U.S.C. § 1983)**

71. Plaintiff Carrie Schmidt, on behalf of herself and on behalf of her two minor children, repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

72. Government entities and officials, including USD 231, its Board of Education, Superintendent Huff, and Principal Bell, cannot deprive an individual of a property or liberty interest without due process of law.

73. Procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

74. Carrie and her two student children each have a strong First Amendment liberty interest not only in access to church, open public meetings, but also in Carrie's right to parent and K.S. and P.S. to be parented, along with each other's the right to associate in the required compulsory school enrollment statutory framework imposed by law.

75. The prior email of Superintendent Huff did not cite to any school policy being applied nor did Huff provide notice that his future "crafting of a letter" was being contemplated as discipline or any kind of adverse consequences including those later issued by Huff.

76. Not only was the email vague in time and facts, Huff then demanded same day – literally less than a business day but mere hours – some kind of response to what Huff described as merely his future amorphous "letter."

77. It was only later in Huff's ban letter that Huff cited policies – and that without any application of facts to any actual language – as to his claim that Carrie had violated any school policy.  And then revealed for the first time the contemplated punishments as well as the fact his "letter" was actually functioning as some kind of Star Chamber ruling with devasting consequences to both Carrie and her children.

78. And in Huff's ban letter he did not set out any process whereby either Carrie or her two children to contest any or all of the consequences meted out to Carrie and her children.   Huff said he might "adjust the contents" in some unknown fashion. Confusingly, it appeared Huff told Carrie to talk to him about some things but other things talk to Bell – or vice versa according to Bell.  P.S. was ejected from her seminar class.  Both P.S. and K.S. lost all parental involvement of the kind other students could receive by having their parents celebrate Senior Night, wrestling events, or Senior graduation.  Carrie forfeited all of that as well.

79. As to this Star Chamber shoot-first-aim-later procedure, *who* exactly were the actual decision makers in obtaining ban exceptions?  "GEHD administration" couldn't be more vague.  Then it appears defendant Huff made up a pretextual *ad hoc* good-cop-bad-cop

procedure, with no guidelines, that Principal Bell would be the gatekeeper of Carrie's requests for exceptions – or was her advocate – or was the actual decision maker.

80. Bell purported to be the "good cop" advocating for Carrie while Superintendent Huff – or the GEHS administration – were the "bad cop" decision makers. But as it turned out, and unknown to Carrie at the time, USD 231's appointment of Bell as Carrie's "advocate" was a white glove sham. It was all theatre as much as a used car salesman's riff to the dealership manager for a better deal for the buyer.

81. The only guideline articulated was arbitrary – that Carrie had to express "remorse" in the eyes of whoever the actual decision makers were.

82. Any interest these defendants had in instituting and enforcing Superintendent Huff's Ban did not justify depriving Carrie and her children of an opportunity to be heard or challenge the Ban with its other consequences.

83. It is unknown what policy, if any, was invoked for this process but it certainly was not fair in failing to provide notice of a policy violation, the possible consequences, and a fair time in which Carrie and her children could be heard. Instead, it was a rush to a judgment that had already been determined by defendant Huff.

84. Without knowing what policy Huff invoked, this written or unwritten government policy fails to provide the kind of notice that will enable a person of ordinary intelligence a reasonable opportunity to know what is prohibited, such policy is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment.

85. It appears someone somewhere possesses either joint or sole discretion to either lift the ban or provide exceptions – but no one knows what guides or constrains any of that

discretion. Plaintiffs have no idea what policy Huff has employed to mete out the consequences or what policy now is applicable going forward. Despite Carrie's repeated requests, no defendant has identified any authority or any policy which authorizes Superintendent Huff to issue a no contact order applicable 24/7 as against Carrie applied to teacher Robertson. Neither has any defendant identified any policy or any authority to authorize the consequences including this ban because Carrie viewed, took pictures, of things posted in hallways and classes which the public can freely view. Nothing in the policies authorize these consequences because Carrie gave Libs of TikTok a picture of what she legally saw. Nothing in the policies could make Carrie responsible for individuals contacting Robertson when her name, image, and school email address, are made public by USD 231 own website. There can be no policy that makes Carrie or her children responsible for third party comments made to Libs of TikTok or to USD 231.

86. Declaratory and injunctive relief preventing enforcement of any of the written or unwritten policies of USD 231 is required to protect Carrie and her children's rights under the Due Process Clause.

**SECOND CAUSE OF ACTION**
**VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH**
**RETALIATION AGAINST ALL DEFENDANTS**
**(42 U.S.C. § 1983)**

87. Plaintiff Carrie Schmidt, on behalf of herself and on behalf of her two minor children, repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

88. Defendant Bell and Superintendent Huff have used (actually leveraged) the treatment of Carrie's children, her removal from the Committee, and the ban as a way to extract what they call "remorse" from Carrie. Carrie is now in a Purgatory of defendant Bell's making; of which Bell is his underling keeper: Bell told Carrie "I read nothing in your email response that even acknowledged any of that, or that you had any remorse." True enough. And as demonstrated in this Complaint, neither do any of the defendants express any remorse for any of their outrageous over-the-top persecution of Carrie and her children.

89. Superintendent Huff's ban meant (and still means) Carrie is deprived of the right to associate with her children during school hours or other times in which they are present at school functions.

90. Not only that now Carrie is deprived of attending the School Board's meetings.

91. And because Carrie dared to repeat the embarrassing words contained in USD 231's school curriculum at Board meeting or online, Board member Chapman made it his personal vendetta to target Carrie for having this very dirty laundry aired.

92. No, the defendant board member Chapman's idea of governance was taking care of business "behind closed doors" without public scrutiny. Defendant board member Chapman's slanderous and grossly mean campaign to suppress Carrie's expose of the many inappropriate and wrong-headed books in the USD 231 curriculum and library became more than apparent when he repeatedly targeted Carrie, and immediately before her speaking time, to demean and embarrass her because of her truthful speech.

93. Defendant Chapman went so low as to cruelly characterize Carrie as pedophilia sexually perverted when he publicly read his statement – a statement that USD 231 has never repudiated or had removed from YouTube: "It seems like she just gets pleasure from reading books with questionable content to this audience where there are minors listening."

94. Chapman wasn't finished in his character assassination shooting this messenger because of her message. When he emailed her, and the many other board members and staff, including the Superintendent, boy or boy was Chapman so proud in boasting about his self-righteous public statement and then smugly telling her that "Carrie, do better, be better, and remember the old saying 'You can catch more flies with a pile of crap than honey, however no one but the flies want the crap.'" Chapman was so full of himself that he ended with "have the day you deserve."

95. The actions and attitudes of these USD 231 defendants reeks of fiefdom entitlement – as though this government school district is their private Star Chamber to meet out punishment as a consequence for its deserved embarrassments.

96. This pompous fiefdom mentality of each of the defendants goes so far as Superintendent Huff actually thinking his throne extends beyond the property boundaries of USD 231 to all places in which USD 231 deigns to step foot upon. Hence Huff proclaims that not only is Carrie punished because of bad publicity by a ban that prohibits Carrie and her children from literally associating on USD 231 property, but anywhere in Kansas – perhaps the nation – anywhere that self-proclaimed Emperor Huff thinks there is a USD 231 "event."

97. Defendants each punished – and continues to punish – Carrie and her two children because of embarrassing publicity which they have no one to blame but themselves. The speech quoting the book passages is real. The photos depicting the very real advertisements of teachers and staff advocating are real. Both are based entirely upon truth demonstrated in an unaltered photo.

98. The defendants Huff and Bell have fabricated pretextual reasons for their nuclear retaliatory bomb directed against her children denying each of them the same kind of parental involvement that other USD 231 students have. Defendants are punishing Carrie using Carrie's children as hostages leveraged to get Carrie to stop Carrie's protected whistleblowing speech.

99. Despite defendant Chapman's utter ridicule and disdain for Carrie's committee work in giving the Board 38 critical book reviews of the inappropriate material contained in those books, those book reviews were accurate and are First Amendment protected activities.

100. Carrie engaged in First Amendment protected activity in notifying defendant Frank Bell that she wanted her son opted out of reading the book "The Absolutely True Diary of a Part-Time Indian."

101. Carrie engaged in First Amendment protected activity in confronting and questioning USD 231 administration if it intended to remove the gender ideology brochures and posters such as printed by the group GLSEN or if it had any plans to comply with the spirit of President Trump's Executive Order.

102. Carrie engaged in First Amendment protected activity in viewing the posters, signs, and brochures attached to the walls and windows of in the hallways and rooms of the USD 231 Gardner Edgerton High School.

103. Carrie engaged in First Amendment protected activity when she photographed what she could lawfully view – and particularly the photograph Superintendent Huff cited in his email and letter which was reproduced by the Libs for TikTok on X.

104. Carrie has engaged in protected activity in appearing at the school board's open meetings, having properly signed up and given permission to speak during her allotted minutes of public speaking time.

105. The Defendants Chapman, Huff, and Bell were each personally involved with the intimidation, harassment, threats, isolating, ostracizing, mocking, falsely accusing, blacklisting, discipline, warnings, reprimands, reporting to police (as though Carrie committed a crime) retaliation through their individual communications with and between each other, caused or contributed to the Plaintiff to be deprived of her and her children's First and Fourteenth Amendment rights in having her free speech rights chilled by the threats and actions of each of the defendants including all of the consequences set out in defendant Huff's letter including Carrie's expulsion from the Educational Services Advisory Committee.

106. The defendants Chapman, Huff, and Bell who were involved with the retaliatory actions describe above, acted under color of state law.

107. The conduct, as described above, of the each of the named defendants Chapman, Huff, and Bell who were involved with the retaliation and termination as described above, resulted in damages to this Plaintiff.

108. Carrie's whistleblowing actions and her confrontation of this school district about its ratification and endorsement of the kinds of things President Trump addressed as improper in K-12 schools were matters of public concern.

109. The Plaintiff's speech related to a matter of public concern.

110. None of any of the interests of the governmental defendants outweigh the interests of the Plaintiff and her plaintiff children.

111. The Plaintiff's protected activities and protected speech was not only a motivating factor in the retaliation and termination, it was the motivating factor for each action of each of the defendants.

112. Carrie Schmidt presents no public safety concern to any member of the public regarding any of the activities that are cited by defendants Huff or Bell.

113. Carrie is not responsible for what a newspaper or internet group truthfully publishes and is not responsible for comments made in the comment section in Libs for TikTok.

114. Defendants retaliated against Carrie using her children and then punishing her children with being removed from class or having parental involvement.

115. Carrie Schmidt has been prohibited from redressing government, her speech, and from associating with those personally attending those events and meetings.

116. USD 231 continues to use its ban and threats of police involvement as leverage to chill Carrie's speech.

117. Since that time Carrie's speech has been restricted altogether from USD 231 property and her threat of arrest has chilled her speech and prohibited her right to associate altogether.  Carrie Schmidt would like to personally and physically attend USD 231 school property, school events, both on USD 231 property and off USD 231 property, which the defendant Huff, with the approval and ratification of USD 231, but has not done so because of violating trespass law.

118. Defendant Huff is a policymaker for USD 231. Each of the defendants are aware of the ban directed towards Carrie Schmidt. The defendant Board had and has authority over the defendant Huff to restrict or modify his policy decisions such as this ban directed to Carrie Schmidt.  Despite having that authority, none of the defendants have done so.

119. Each defendant Board has ratified or condoned defendant Huff' ban and the Boards' speech code as applied to Carrie Schmidt. *See Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir.1991).  An inference of policy or custom may be drawn from a failure to take remedial action after a constitutional violation.

120. Defendants had a policy or custom of viewpoint discrimination from the failure of Board to take any remedial steps after the violation. *Larez; Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985).

121. Defendant Huff violated plaintiff and her children's first amendment rights to speak and assemble by Huff's ban which has no guidelines by which would limit his or Bell's arbitrary interpretation or enforcement.

122. Debate on public issues does not always—or even often—boil down to whether one is for or against a particular proposal. And because of that, the "First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side." *Matal v. Tam*, 582 U.S. 218, 249 (2017) (op. of Kennedy, J.). "It protects the right to create and present arguments for particular positions *in particular ways, as the speaker chooses.*" *Id.* (emphasis added).

123. Defendants Chapman, Bell, and Huff targeted Carrie Schmidt because of her status and viewpoints and used each of their respective animosity and predispositions against Carrie Schmidt and their respective political viewpoints as a basis to retaliate and permanently ban, and continue to ban, Carrie Schmidt from USD 231 property.

124. Church services are conducted on USD 231 property.

125. Each day that defendant Huff banned Carrie Schmidt from any physical presence on USD 231 property, church attendance, or attendance at USD 231 school board meetings that occur on USD 231 property constituted a prior restraint on speech which was further evidence of retaliation because banning Carrie Schmidt from all USD 231 buildings is not only unconstitutional, it is not reasonable or necessary.

126. Defendant Huff does not have authority to ban Carrie Schmidt from personally attending church on USD 231 property or in attending school board meetings. There is nothing in the School Board's participation policy that provides any Board member,

much less defendant Huff, to prohibit anyone, including Carrie Schmidt, from attending an open meeting conducted by the School Board.

127. In *Vollmecke v. Independence School District v. Independence School District,* Case No. 23-00644, 2023 WL 11200382 (W.D. Mo. Dec. 11, 2023),  Judge Phillips enjoined that school district from enforcing a one year ban from school property.  Judge Phillips later granted summary judgment to the plaintiff (*Vollmecke v. Independence School District v. Independence School District,* Case No. 23-00644, 2023 WL 4524547 (W.D. Mo. October 11, 2024)). Even though the ban expired in January 2024, Plaintiff was "still restricted from participation with ISD Academies because [Superintendent] Herl does not believe Plaintiff is a good role model." *Id.* at *4. Judge Phillips granted summary judgment in favor of the plaintiff on Count 1 ("Ban impermissibly restricted speech in a public forum, a First Amendment Violation") and Count 3 ("the Ban, Policy 1431, and Policy C-155-P violate procedural due process by not offering a meaningful opportunity to be heard").  Judge Phillips held the Superintendent  Herl was not entitled to qualified immunity. *Id.* at *7-8, *10.

128. "Courts have consistently held that categorically banning individuals from open school board meetings is unreasonable and unconstitutional." *Mama Bears of Forsyth County v. McCall,* 642 F.Supp.3d 1338, 1362 (2022).  As Judge Phillips recognized, "courts have only upheld such limitations on protected speech where a true threat or disruption existed" (citing *Davison v. Rose,* 19 F.4th 626, 641 (4th Cir. 2021); *Lovern v. Edwards*, 190 F.3d 648, 656 (4th Cir. 1999); *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir.

2015) (property ban from the state senate building after one instance of disruption "clearly exceeds the bounds of reasonableness")).

129. Courts have found bans similar to defendant Huff as unreasonable where unfulfilled safety risks were alleged. *Worthley v. Sch. Comm. of Gloucester*, 2023 WL 371034, at *6 (D. Mass. Jan. 24, 2023) (no trespass order was preliminarily enjoined as overbroad and unreasonable); *Coffelt v. Omaha Sch. Dist.*, 309 F. Supp. 3d 629, 632 (W.D. Ark. 2018) (ban preliminarily enjoined); *Wilson v. N.E. Ind. Sch. Dist.,* 2015 WL 13716013, at *1, 5-6 (W.D. Tex. Sept. 30, 2015) (school property ban was unreasonable); *Brown v. City of Jacksonville,* 2006 WL 385085, at *1 (M.D. Fla. Feb. 17, 2006) (ban from city council meetings was preliminarily enjoined as not appropriately tailored).

130. If USD 231 wanted to keep the identities or email addresses of each teacher secret or otherwise private, it has not done so in publishing that in its online website.  Yet USD 231 blames Carrie for the availability of that information.

131. The posters, signs, and brochures posted by teachers and staff at the school appears to be the result of an entirely voluntary decision by the teacher or staff who knows that whatever is placed on the door, wall, or window is not private but available for public viewing. Carrie's photo of posters, signs, and brochures posted voluntarily by a teacher or staff in a government school building in which students, visitors, and staff have permissible access to is protected activity and matters of public concern.

132. Judge Story in *Mama Bears* further ruled that "singling out one individual, banning his (perhaps disfavored) speech, and essentially preventing him from engaging

in a form of civil discourse that is available to everyone else ... is unreasonable." (quoting *McBreairty v. Sch. Bd. of RSU 22*, 616 F.Supp.3d 79, 96 (D. Me. July 20, 2022)).

133. The government defendants cannot prohibit future expressive activity by Carrie Schmidt as a result of some undefined and unarticulated violation of state law (which Huff never identifies) or attempts to explain how anything Carrie did violated any USD 231 policy.

134. Defendants are still utilizing their vague allegations of misconduct so that Carrie has to guess what policy or law and how it was violated. This is raw retaliatory censorship. *See Polaris Amphitheater Concerts, Inc. v. City of Westerville,* 267 F.3d 503, 507 (6th Cir. 2001) ("where a law sets out primarily to arrest the future speech of a defendant as a result of his past conduct, it operates like a censor, and as such violates First Amendment protections against prior restraint of speech").

135. Defendants banned Carrie Schmidt from participating or speaking at a public speaking section by muting her microphone. *See Mnyofu v. Bd. of Educ. of Rich High Sch. Dist. 227,* No. 15 C 8884, 2016 U.S. Dist. LEXIS 45773, at *2 (N.D. Ill. Apr. 5, 2016) (Commission shut off the microphone in the midst of a citizen activist's speech).

136. There is no authority contained in the Board's policies to prohibit any of the activities of Carrie identified in this Complaint.

137. The actions of the defendants were unreasonable, not narrowly tailored because prospectively banning a speaker without proof of dangerousness interferes with the speaker's right to interact with elected representatives. Under this policy, Carrie Schmidt was and continues to be  subjected to open meeting bans for unidentified

violations without any evidence of disruption or danger to anyone and without any Board authority to do so. This objectively and unreasonably chills speech. *See Walsh v. Enge,* 154 F. Supp. 3d 1113 (D. Or. 2015) (court enjoined enforcement banning speakers from city council chambers).

### THIRD CAUSE OF ACTION
### VIOLATION OF PLAINTIFF'S FOURTEENTH AMENDMENT RIGHT TO
### EQUAL PROTECTION OF THE LAW AGAINST ALL DEFENDANTS
### (42 U.S.C. § 1983)

138. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

139. Carrie was punished by each of the defendants because of her protected activities.

140. When Carrie attempted to read or did read parts of books contained in the USD 231 curriculum, she was targeted for abuse by Chapman.

141. When others did so they were not targeted by Chapman.

142. When other students, staff, visitors, or parents, take pictures or videos on school property, they are not banned from school property.

143. When others such as Erika Sheets or the other individuals appearing at the open meeting associated with Moms for Liberty complain or say negative or embarrassing things about USD 231 they have not been banned from USD 231 property. Yet when Carrie does the same thing she is treated unequally in being banned, removed from Committee, and prohibited from even participating in school activities with her children. The First Amendment limits the government's authority to regulate private speech on public property. *Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997).

144. Plaintiff is a "class of one" and alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215-16 (10th Cir. 2011).

145. "A violation of equal protection occurs when the government treats someone differently than another who is similarly situated." *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, Kan., 927 F.2d 1111, 1118 (10th Cir. 1991).

146. Carrie Schmidt has named specific speakers in this Complaint who are comparators – similarly situated – to Carrie Schmidt. Each public speaker dresses in an individual manner. Each speaker waits his or her turn to approach the podium. No speaker is required to be a resident – and the only requirement is that the speaker provide a name – whether true or an alias.

147. Carrie Schmidt is similarly situated to other parents who criticize school curriculum at school board meetings, online in postings, or in other venues. Carrie is similarly situated to other parents who photograph USD 231 rooms and hallways.

148. Defendants have chosen to take no adverse action against individuals who support or endorse the viewpoints displayed in the photos in this Complaint as the defendants like such as complimentary statements about students and staff, but they take adverse action against a speaker like Carrie who has different viewpoints about the same topics and brings up viewpoints that are personally embarrassing or offensive to the defendants.

149. After taking the many adverse actions against Carrie Schmidt for photographing or using scotch tape to adhere her signs for the snack packs, the defendants have made up pretextual reasons to punish and treat Carrie differently while the defendants have knowingly refrained from taking the same adverse actions against other parents or speakers who have purportedly violated USD 231 speech code in the same manner or in discussing the same topics and viewpoints as the plaintiff Carrie Schmidt.

150. Defendants' customs, practices, and their enforcement have also been applied to discriminate intentionally against Carrie Schmidt' rights (and her two children) to freedom of speech, right not to be retaliated against because of Constitutional protected activities, the right to associate, right to be free from unconstitutional conditions, and right to due process of law. Thus, discriminatory intent is presumed.

151. Defendants' Policy and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to School Board's asserted interests unprohibited.

152. Defendants applied their Policy and related practices to Carrie Schmidt in a discriminatory and unequal manner, granting other speakers the right to express their views on the same topics and subjects as Carrie Schmidt attempted to speak on while denying that right to Carrie Schmidt, in violation of Carrie Schmidt' right to equal protection of the law under the Fourteenth Amendment.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT TO ASSOCIATE, FREEDOM OF SPEECH AND RELIGION AGAINST ALL DEFENDANTS NOT NAMED GREG CHAPMAN (42 U.S.C. § 1983)**

153. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

154. Carrie had permission to be on USD 231 property when she viewed the signs, posters, and brochures publicly displayed on the walls and windows of that high school.

155. The one complainant who appears to be teacher Robertson posted both her former married last name and current last name on her classroom window facing the hallway. With that Robertson posted GLSEN brochures or advertisements on the same window facing the hallway. Robertson's identity as a teacher is publicized by USD 231 with a photo and associated school email address.

156. USD 231 is certainly entitled to keep its private property private. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 390–91 (1993). But the rules change when the government opens its property for others to have access and to speak. *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829 (1995).

157. The defendants have not kept all of USD 231 property private at all times as it permitted Carrie to come into the school after school hours.

158. Not only that USD 231 contractually rents to churches to conduct religious activities on Sundays.

159. USD 231 has contractually opened its school property to the purposes of those who rent school space on the property on Sundays, including churches. Once USD 231 has opened its school property forum "the State must respect the lawful boundaries it has

itself set." *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829 (1995).
In addition to time, place, and manner restrictions, the government may enforce
content-based restrictions on speech, but only insofar as those restrictions "preserve the
purposes of that limited forum." *Id.* at 830.

160. Churches rent USD 231 school locations on Sunday and because of the defendants'
ban directed at Carrie Schmidt, Carrie Schmidt is prohibited from associating with
those parishioners, listening to messages, or in participating in those religious
exercises.

161. Carrie Schmidt has a First Amendment right to access USD 231 public property
which in many cases is a designated public forum. *See Doe v. City of Albuquerque*, 667
F.3d 1111, 1129 (10th Cir. 2012). Regulations on speech in public and designated public
forums require more exacting scrutiny. *Cole v. Goossen*, 402 F. Supp. 3d 992, 1013 (D.
Kan. 2019).

162. The public continues to be invited to USD 231 public events which are public
forums. Yet Carrie cannot do so unless she convinces defendant Huff to allow her to do
so – a requirement no other person labors under. This Count implicates two distinct
First Amendment interests: Carrie Schmidt right to engage in speech and her right to
receive information through attendance at the USD 231 public events including church
services in which the public is invited to attend.

163. There is no question that these two interests are protected under the First
Amendment. *See Stanley v. Georgia*, 394 U.S. 557, (1969) ("Constitution protects the
right to receive information and ideas"); *Board of Educ., Island Trees Union Free Sch.*

*Dist. No. 26 v. Pico,* 457 U.S. 853, 867 (1982) ("right to receive ideas follows ineluctably from the sender's First Amendment right to send them"); *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.,* 619 F. Supp. 3d 906, 913 (E.D. Mo. 2022); *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982). *L. H. v. Indep. Sch. Dist.,* No. 4:22-CV-00801-RK, 2023 WL 2192234 (W.D. Mo. Feb. 23, 2023).

164. Defendants' ban directed to Carrie Schmidt violates, much less does not preserve, the purpose of the church forums conducted on USD 231 property on Sundays.

165. There is no purpose of USD 231 to legitimately keep secret the publications of brochures and signs of its teachers in USD 231 school buildings.

166. Speech in a USD 231 school district public forum cannot be discriminated against based on viewpoint, and the restriction must be "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985).

167. Carrie Schmidt has a First Amendment right to exercise religion and attend church services and meetings conducted on USD 231 property which are at least public forums open to the public. Defendant Huff' ban applied to Carrie Schmidt violates her rights to associate, exercise religion, and free speech.

168. Defendants actions have suppressed and altogether prohibited Carrie Schmidt "to petition the government for a redress of grievances." U.S. Const. amend. I.

169. The First Amendment right to petition the government for redress "extends to all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Generally speaking, claims under the Petition Clause are

"analyzed no different than" a claim under the Free Speech Clause. *Glover v. Mabrey*, 384 F. App'x 763, 776 (10th Cir. 2010).

170. Appearing before an elected school board to engage in a public discussion about school policy constitutes "petition[ing] the Government for a redress of grievances." U.S. Const. amend. I.

171. As applied to Carrie Schmidt, defendant Huff' time, place, and manner restrictions directed to Carrie Schmidt regarding USD 231 property is unconstitutional, irrational, and unreasonable.

### FIFTH CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Content & Viewpoint Discrimination against all Defendants
### (42 U.S.C. § 1983)

172. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

173. The defendants have suppressed Carrie Schmidt's speech because of her prior and present viewpoints. The manner in which defendants apply whatever speaking policies defendants think apply does ban certain ideas—viewpoints about staff that defendants or teacher Robertson thought were embarrassing, did not like, or was criticism of school officials – but not complimentary speech about the same topics and individuals.

174. It makes no difference that the defendants allow other forms of criticism. *See Rosenberger,* 515 U.S. at 831.

175. The defendants have suppressed Carrie Schmidt's speech because of the viewpoints she has expressed or wants to express at open meetings conducted by the School Board.

176. The defendants have not drawn "a reasonable line" when regulating the content of speech at its open meetings. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018).

177. Government bears the burden of "articulat[ing] some sensible basis for distinguishing what may come in from what must stay out." *Id.* And its rules must further—rather than undermine—the purpose of the forum. *Id.* at 1891. Thus, the defendants inconsistent categorical bans on certain kinds of speech of Carrie Schmidt violate the First Amendment because defendants cannot explain "why such a restriction 'preserves the property' for the . . . uses to which it has been put." *Int'l Soc'y for Krishna Consciousness v. Lee,* 505 U.S. 672, 692 (1992) (O'Connor, J., concurring).

178. The defendants' respective actions targeted certain viewpoints on a subject matter such as defendant Huff, USD 231 students and staff.  Defendants have targeted Carrie Schmidt' particular views on those topics for disparate and adverse treatment. Defendants restricted and punished Carrie Schmidt' views because they didn't like her and because of their respective specific motivating ideology, opinion, and perspective.

179. Defendants inconsistent and ostensible ban on Carrie Schmidt mentioning book material or simply photographing what has long been published for public consumption in the hallways of the Gardner Edgerton High School.

180. Defendants purported application of its speech or activity policies to Carrie reaches far broader than whatever legitimate interest Defendants may have for enacting or applying its policies.  And it imposes an expansive ban reaching its purported purpose of not being embarrassed or having a teacher's political viewpoints criticized by the public.

181. A ban photographing this material or in how or if Carrie disseminates this public material is not reasonable in that forum.

182. Defendants restricted and punished Carrie's views because of her specific motivating ideology, opinion, and perspective. The defendants view Carrie Schmidt as an unwelcome antagonist due to her speech about books and President Trump' recent Executive Order.

183. Each defendant acted with a viewpoint-discriminatory purpose when Carrie Schmidt' speech and her activities were suppressed.

184. Defendant Huff acted with a viewpoint discriminatory purpose when he banned – and continues to ban – Carrie Schmidt from USD 231 property.

185. Defendant Huff's' reasoning or explanations justifying his adversarial actions of removing Carrie's daughter from her class, punishing her children with threats and actual bans as to their mother's participation at Senior Night, or graduation, teacher conferences, or wrestling matches in the Olathe school district are a sham.

186. Nor can defendants "articulate some sensible basis" for banning Carrie because Libs for TikTok decided to publish a photo truthfully depicting signs and brochures in that school – which to this day still exist.

187. Hypothetically, the board may offer up a handful of justifications – preventing harassment and defamation of employees, protecting their confidential information, and maintaining orderly meetings. But the identity of USD 231 teachers is not confidential. The signs and brochures are not secrets.

188. The Free Speech Clause prevents the government from wielding its power to "manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys. v. FCC,* 512 U.S. 622, 642 (1994). This "constitutional safeguard, [the Supreme Court] has said, was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.". It is "the theory of our Constitution" that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). And if the First Amendment does anything, it prevents the government from interfering in public debate to "effectively drive certain ideas or viewpoints from the marketplace" of ideas. *Turner Broad.*, 512 U.S. 641.

189. Defendants are manipulating public debate in its application of the public comment rules as applied to Carrie Schmidt. "The Supreme Court has long…warned about the pernicious effects of an artificially controlled public debate and [has] held that the First Amendment serves to prevent such manipulation." *Bach v. Sch. Bd. of Va. Beach,* 139 F. Supp. 2d 738, 742 (E.D. Va. 2001).

190. That danger exists because the defendants regulate the content of Carrie Schmidt' speech, and it is no less worrisome that the government manipulates debate on its own property. *See Rosenberger*, 515 U.S. at 831–32 (adopting a broad interpretation of viewpoint discrimination to prevent a university from "skewing" public debate in a limited public forum).

191. The defendant school board, of course, can choose not to open a public comment forum at all in its open meetings. But it cannot open a forum that skews "the

marketplace of ideas." *See id.* at 831. That's because "the first amendment is concerned, not only with the extent to which a law reduces the total quantity of communication, but also -- and perhaps even more fundamentally -- with the extent to which the law distorts public debate." GEOFFREY R. STONE, CONTENT REGULATION AND THE FIRST AMENDMENT, 25 WM. & MARY L. REV. 189, 198 (1983).

192. This Court should prevent the defendants from manipulating debate where defendants purport to set up an ostensibly free and fair discussion that turns out to be neither. The First Amendment cabins the government's power over speech even in a limited public forum – and why defendants speech rules directed at Carrie Schmidt is unconstitutional. Content-based restrictions must be viewpoint-neutral – when this school board allows for input on school personnel and students, that is the topic. Defendants cannot be permitted to prevent Carrie Schmidt from sharing her own unique message about that topic. And content-based restrictions must be reasonable – because the Board opens a forum for discussion about staff and students, it cannot undermine that discussion by excluding otherwise relevant speech.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT TO FREEDOM OF SPEECH**
**DECLARATORY AND INJUNCTIVE RELIEF**
**AS APPLIED CHALLENGE AGAINST ALL DEFENDANTS**

193. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

194. In defendant Huff's letter, he cites USD 231 school board policies KGB, KBC, KGD, KGDA, KFD & KM. But Superintendent Huff never bothers to identify any facts or any connection of the facts to any language contained in any of those policies.

195. These policies have been applied to the plaintiff Carrie Schmidt in a discriminatory and disparate fashion irrespective of whether they are facially constitutional.

196. There is nothing in any of those policies cited by Huff that gives the Superintendent authority to ban a parent from USD 231 property, or in attending the Board's open meetings, or in attending public functions such as church services during school off hours.

197. There is nothing in any of those policies that gives Superintendent Huff the authority to issue his own no contact order with a teacher, either while on duty or during the teacher's off duty time.

198. There is nothing in any of those policies that gives Superintendent Huff the authority to ban Carrie from property not owned by USD 231.

199. There is nothing in any of those cited policies that prohibit Carrie from viewing or photographing the things depicted in the pictures contained in this Complaint.

200. There is nothing in any of those policies that gives Superintendent Huff the authority to ban Carrie from taking pictures that she took displayed in this Complaint.

201. There is nothing stated in any of the cited policies that provide teachers the unfettered right to post brochures or signs on their classroom walls or windows while having a right to keep that a secret or concealed from school parents.

202. Nothing in any of USD 231 policies authorizes board member Chapman to communicate to Carrie that "it seems like she just gets pleasure from reading books with questionable content to this audience where there are minors listening."

203. There is nothing in the policies Huff cited that would constrain or otherwise guide his or Bell's determinations or discretion as to modifying Huff's ban. "It is self-evident that an indeterminate prohibition carries with it the opportunity for abuse." "That discretion must be guided by objective, workable standards." *Mansky* at 1891.

204. The defendant's respective actions exceed the authority provided in the Board's policies.

205. There is no authority in the USD 231 policies for defendants Huff or Bell to meet out adverse consequences to Carrie and particularly banning her from USD 231 property.

206. At the injunction and trial level, the burden is upon defendants to justify their actions. *See Greater Phila. Chamber of Commerce v. City of Phila.,* 949 F.3d 116, 133 (3d Cir. 2020) (In "First Amendment cases the initial burden is flipped"); *See Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 660 (2004) (same). The government bears the burden of proving the law is constitutional, tracking the burdens at trial. *Id.*

207. Each defendant bears the burden to show each and every reason each defendant suppressed Carrie Schmidt' speech and his subsequent removal was Constitutional. *See Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2426 (2022) ("Whether one views the case through the lens of the Free Exercise or Free Speech Clause, at this point the burden shifts to the District").

208. Defendants cannot sustain their burden that each of their actions was Constitutional.

209. Unless the policy and conduct of each of these defendants are enjoined, Carrie Schmidt will continue to suffer irreparable injury to her First Amendment rights to associate, petition government, engage in protected speech, and to religious exercise.

210. Carrie's two minor children will continue to suffer irreparable injury to their right to equal protection and right to associate with their mother.

211. Putting aside the board meetings, USD 231 has opened up the high school premises to be a designated public forum of a viewpoint discriminating kind. Teachers and staff can speak about anything and post all kinds of moral or political signs and posters. The "Supreme Court has sorted government property into the following categories: traditional public forums, designated public forums, limited public forums, and nonpublic forums." *Pollak v. Wilson,* No. 22-8017, 2022 WL 17958787, at *1 (10th Cir. Dec.27, 2022) (unpublished); *see Verlo v. Martinez,* 820 F.3d 1113, 1144, 2016 WL 1395205, at *24 (10th Cir. Apr. 8, 2016) ("forum status is an inherently factual inquiry about the government's intent and the surrounding circumstances that requires the district court to make detailed factual findings").

212. The erratic and standardless application undermines any claim the high school is a limited public forum. *See Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.,* 767 F.2d 1225, 1232 (7th Cir. 1985) (inconsistent and loose application of policy was "laissez-faire" and created designated public forum); *See also Gregoire v. Centennial Sch. Dist.,* 907 F.2d 1366, 1374 (3d Cir. 1990) ("access to many diverse groups" evinced intent to create designated public forum); *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1998) ("In accepting a

wide array of political and public-issue speech, SORTA has demonstrated its intent to designate … a public forum"). "Having effectively opened its doors to all comers, subject only a standardless standard," USD 231 has "failed to exercise the clear and consistent control" over the scope of speech "required to maintain a [limited] public forum." *Hopper v. City of Pasco*, 241 F.3d 1067, 1080 (9th Cir. 2001).

213. A "designated public forum is treated the same as a traditional public forum when assessing the government's ability to restrict speech." *Sessler v. City of Davenport*, 102 F.4th 876, 882 (8th Cir. 2024); *Pleasant Grove City v. Summum,* 555 U.S. 460, 469 (2009) ("subject to the same strict scrutiny as restrictions in a traditional public forum").  To satisfy strict scrutiny, defendants must first "specifically identify an actual problem in need of solving." *Brown v. Ent. Merchants Ass'n,* 564 U.S. 786, 799 (2011).

214. The defendants have no workable standards to impose the Huff ban and his consequences or how to apply exceptions to that ban. Strict scrutiny with narrow tailoring applies to all of the actions of these defendants.

**PRAYERS FOR RELIEF**

215. As to all counts, Defendants, under color of law, have deprived and continue to deprive the plaintiff of the right to free speech, equal protection, right to associate, and freedom of religion in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, this plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, is entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the

defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

216. To obtain a permanent injunction, Carrie Schmidt "must prove (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *United States v. Uintah Valley Shoshone Tribe*, 946 F.3d 1216, 1222 (10th Cir. 2020). On the first factor, Carrie Schmidt succeeds on the merits for the reasons discussed above. She suffers irreparable harm absent an injunction because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020). Finally, the last two factors merge when the opposing party is the government, *Denver Homeless out Loud v. Denver,* 32 F.4th 1259, 1278 (10th Cir. 2022), and injunctions "protecting the core First Amendment right of political expression" serves the public interest, *Homans v. City of Albuquerque,* 264 F.3d 1240, 1244 (10th Cir. 2001). Thus, all four factors favor Carrie Schmidt.

217. Carrie Schmidt' right to be free of a ban from entering school property, from attendance at church meetings on school property on Sunday, and from attendance at open school board meetings occurring on school property, was and is, at the time of the events in question, so clearly established by then-existing precedent that it was and is beyond debate.

218. Carrie Schmidt' right to be free of being removed from Committee, then having her children retaliated against, then a ban from all USD 231 property, is based on retaliatory motives directed to Carrie Schmidt and was and is, at the time of the events in question, so clearly established by then-existing precedent that it was and is beyond debate.

219. Carrie Schmidt' First Amendment rights were callously, maliciously, and wantonly violated by each defendant sued in their individual capacity.

220. Carrie Schmidt First Amendment rights were oppressively violated by each defendant sued in their individual capacity.

221. The acts by the defendants in this Complaint were prompted or accompanied by ill will, or spite, or grudge, either toward Carrie Schmidt individually, or toward persons in one of more groups or categories of which Carrie Schmidt is a member.

222. The acts by the defendants in this Complaint were done in reckless or callous disregard, or indifference to, the rights of one or more persons, including Carrie Schmidt.

223. The acts by the defendants in this Complaint were done in a way or manner which injures, or damages, or otherwise violates the rights of Carrie Schmidt with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of Carrie Schmidt.

WHEREFORE, the plaintiff requests that judgment be entered in his favor and against each defendant as follows:

A.   Enter a permanent injunction forbidding Defendants from banning Carrie from attending meetings or events on USD 231 property which are leased to third parties during off-school hours such as churches;

B.   Enter a permanent injunction forbidding Defendants from banning Carrie from attending USD 231 Board meetings open to the public in the absence of notice and an opportunity to contest such a ban, and provide such further declaratory relief as this Court deems just and proper;

C.   Enter a permanent injunction enjoining these defendants from banning Carrie Schmidt from entering upon USD 231 property for the reasons claimed by defendant Huff in the absence of notice and an opportunity to contest such a ban, and provide such further declaratory relief as this Court deems just and proper;

D.   Enter a permanent injunction forbidding Defendants from enforcing its unwritten or written policies using the process utilized by defendant Huff to ban Carrie from activities and events on USD 231 property;

E.   Enter a permanent injunction forbidding Defendants from enforcing its unwritten or written policies using the process utilized by defendant Huff to enact or enforce a no contact rule prohibiting Carrie from any and all contact with teacher Robertson at any time;

F.   Enter a permanent injunction forbidding Defendants from making or enforcing its unwritten or written policies using the process utilized by defendant Huff to ban Carrie from activities and events on property not owned by USD 231;

G.  Enter a permanent injunction forbidding Defendants from enforcing any unwritten or written policy that purportedly authorizes the Board or school Superintendent to ban individuals from activities and events on School District property that are open to the public, including open public meetings of the Board of Education and sporting events, unless any such ban is both reasonable in light of the forum's purpose and viewpoint neutral, and provide such further declaratory relief as this Court deems just and proper;

H.  Enter a judgment declaring that that each of the Defendants violated Carrie's First Amendment rights by banning her from church attendance on Sunday at churches located on USD 231 property, open public meetings of the Board of Education, from sporting events, having any contact with teacher Robertson, and from other activities and events on or off School District property that are open to the general public since February 11, 2025, and by unlawfully retaliating against her for exercise of his First Amendment rights;

I.  Enter a judgment declaring that Defendants each violated Carrie and her two children's Fourteenth Amendment rights by failing to provide each of them with an opportunity to contest the consequences identified in defendant Huff's letter, including the Ban and by banning her pursuant to an unconstitutionally vague policy that failed to provide reasonable notice of what activities could subject her and her children to those consequences and by failing to set guidelines to prevent arbitrary and discriminatory enforcement;

J.  Enter a judgment declaring that the Defendants' unwritten or written policies are unconstitutionally vague and are unconstitutional on its face and as applied to Carrie and her children insofar as it permits a single individual, the Superintendent, to restrict access to USD 231 property, as well as non-USD 231 property, public forums on school property in his discretion, at any time, without regard for rights of the person, the purpose of the forum or protection for the viewpoint of the speaker;

K.  Declaratory relief consistent with the injunction;

L.  An award of actual damages to the plaintiff;

M.  An award of nominal damages to the plaintiff;

N.  Against each individual defendant in their individual capacity an award of punitive and exemplary damages to the plaintiff;

O.  Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988 and any other relief as the Court deems just and appropriate.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by Jury on all causes of action.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:          913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff

Verification of Complaint

I, Carrie Schmidt, am the plaintiff in the above-captioned matter. I have reviewed the foregoing allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Date: _02-14-2025_          By: _Carrie Schmidt_

                          Carrie Schmidt